15-10810, Joseph and Amy McKinney v. United States. Ms. Bringer. Good morning and may it please the Court. My name is Nora Bringer and I represent the United States in this appeal. There are three issues on appeal. The taxation of the settlement payment the McKennys received from Grant Thornton, the business expense deduction for legal expenses the McKennys claimed to have paid for their lawsuit against Grant Thornton, and third, the business loss deduction they claimed for the tax liabilities and excess of that settlement payment. I'd like to start, if I may, with the taxation of the settlement payment. There's no dispute here about the McKennys' actual relevant financial history for 2000 through 2005. The employee stock ownership plan at issue, which we call the JMM ESOP, and our briefs, was never lawful. It was never a qualified plan under the Internal Taxpayers state in their initial brief that the ESOP was never properly formed, and the closing agreement for the entities that Mr. McKenny signed on behalf of those entities states that the JMM ESOP was not qualified from its inception. Not qualified, not because it was per se illegal, but not qualified because the proper steps weren't taken, right? Your question is what exactly was wrong with the ESOP, but we know there were two things wrong with it. One, that it improperly held this ownership, McKenny's ownership of the car dealership in Florida, but also that it was never qualified from its inception. On the McKenny's list, a laundry list of things that they claim went wrong, but there's no evidence in the record one way or the other about whether those things were done. What we do know is that the plan was not, in fact, a qualified plan. As it was done. Yes, Your Honor. In other words, the district court thought, and you may take issue with this, but the district court thought that what the McKenny's were trying to accomplish could have been legally accomplished during that relevant time period, even though the IRS later said that's an abusive tax shelter and you cannot do it. So, Your Honor- Do you think the district court got that overall general background right or wrong? It's a little more complicated. No, of course, I'm summarizing. Than right or wrong. And we're certainly not tax experts. So the ESOP owned two businesses, essentially, of Mr. McKenny's. One business was his consulting business and the other was this ownership of the car dealership in Florida. Now, hypothetically from 2000 through 2004, I remember the period goes all the way through 2005 that we're talking about. But hypothetically, if everything had been done right from 2000 to 2004, the ownership of the consulting business could have been lawful. The ownership of the car dealership never could have been lawful. And in 2005, the entire structure was unlawful. So that's the full answer. In those years, the McKenny's channeled $3.6 million from those two businesses to this unqualified ESOP. And after the IRS determined that the ESOP had engaged in an abusive transaction, this is the management S-Corp ESOP transaction, which is a mouthful. The McKenny's voluntarily entered the IRS settlement initiative and signed a closing agreement acknowledging that they owe the $2.2 million in tax liabilities. Now, the Supreme Court has made clear that tax consequences must be determined based on taxpayers' actual financial history and the actual financial transactions that they engaged in. And here, the McKenny's actually channeled millions of dollars to an unlawful ESOP and didn't pay taxes on that income, and then later acknowledged that they owed the tax liabilities. That is the actual financial history that the tax consequences here must be based on. This is rooted in a broader framework about what is income under the Internal Revenue Code. And Section 61 of the Internal Revenue Code says that all income is gross income. In Glenn Shawglass, the Supreme Court said that Congress intended to tax all gains except those that are specifically exempted. And the McKenny's bear the burden of showing that the settlement payment is not taxable. Can I ask you a theoretical question just to try to get my head around the tax consequences? If you say that the whole transaction could have been structured in a way from 2000 to 2004 to have allowed the consulting business to have been done the way the McKenny's wanted to, why isn't, at least in part, the settlement from Grant Thornton a return of capital, i.e. taxes that would have been avoided had that structure been done the right way? So the Supreme Court has made clear in a couple of cases that we discuss in our brief, especially National Alfalfa and Safety Car, that tax effects are determined by what actually occurred. And what actually occurred here is that the ESOP was not, in fact, a qualified plan and that it could not, in fact, defer any income tax on the income that was put into the ESOP. And so the McKenny's don't discuss that issue, which is our central argument in our brief and their response to our opening brief. And they never explain and have waived the opportunity to explain how their position can be reconciled with that fundamental idea that taxpayers choose the transactions they enter into and, once they've done that, have to live with the tax consequences. Is it an exaggeration to say that your position is a very broad one, that in a case like this where the transaction is structured in a way that violates the tax code and triggers substantial tax liability, settlement obtained from a tax professional for legal – for professional malpractice is always going to be income? Well, Your Honor – Because if you say the taxpayer chose a transaction they entered into, whether it was done the law, it seems to me you're arguing that those settlement proceeds from the tax professional for having committed malpractice can never, ever, ever be a return of capital. Yes, Your Honor. Where a taxpayer has paid the tax he or she actually owes based on the transactions entered into – But that's always going to be the case, even if the taxpayer hadn't paid the taxes. You get a judgment against the McKinney's, and the judgment is – let's say you don't have any money anymore. And you get a judgment, and the judgment is you owe two million plus in taxes because you did this the wrong way and this was not a qualified ESOP, et cetera. In that scenario, any settlement proceeds could never be a return on capital under your theory. Yes, Your Honor, that's true. Where a taxpayer pays the taxpayer, oh, that's not a loss and there's no return on capital. Or doesn't pay it. You mean it's just liable for the tax. I'm sorry, Your Honor. It's just liable for the tax, not that he pays it. Your position would be the same even if the McKinney's had zero in their bank accounts and couldn't pay the money to the IRS, right? Yes, that's correct. That's right. And the return of capital concept, I'd like to say a few words about that. We discuss it briefly in our briefs. It's not a good fit in the tax refund context. The return of capital context comes into play when a taxpayer has basis, and the Internal Revenue Code defines what basis is, has basis in an investment. And, for example, let's say you buy $50,000 worth of stock. And you sell that stock for $75,000 down the road. The taxable amount, of course, is the difference between $50,000 and $75,000. It's the $25,000 gain. The $50,000 that one would get back on the stock sale, that is return of capital. That's the taxpayer's basis. Here, taxpayers don't have a basis in a tax liability. The concept just simply isn't a good fit. It's a square peg in a round hole. Do you disagree with the Clark v. Commissioner case from the Board of Tax Appeals, or do you think it's somehow different than this case? Your Honor, the IRS, since 1992, has drawn a distinction between the outcome in the Clark case and a number of other situations that are similar to the McKinney's here. And that distinction is that, in the Clark case, looking at their actual financial history, their financial transactions for tax year 1932, which was at issue there, the Clarks paid more than the minimum amount of tax they could have owed due to a mistake in reporting. And in that situation, the IRS has taken the administrative position that where a taxpayer pays more than the minimum amount of tax they could have paid, again, based on what they actually did, that that can be seen as a loss and not as income. But where a taxpayer pays the amount he or she owes, which is the case here, based on what actually happened during the relevant tax years, any reimbursement of that is taxable. What was the error in Clark that led to the overpayment, or potential overpayment? So, in Clark, the tax advisor filed joint tax returns instead of separate tax returns. It was just an error in reporting. Same financial facts for the year. If they had filed separate returns, they would have owed $20,000 less than they did having filed their joint returns. But aren't they stuck with what they filed, under your theory? So, Your Honor, again, the Supreme Court cases and the other cases we cite in our brief focus on the financial transactions the taxpayer entered into. And so the IRS administratively has drawn that line between the actual financial history of the taxpayers versus the reporting. But if Clark is wrong, and if the IRS's administrative position is wrong because it contradicts the of course it's the Supreme Court precedent that governs. Is your best case the old colony, or are you depending upon something else? Your Honor, old colony is certainly part of the analysis, and an important part, because that case stands for the idea that any payment of one's tax liability, and of course a reimbursement for tax liability is economically the same, is taxable income. And I'd like to note that in addition to the legal issue that we've been discussing here, the McKinney's did not meet their summary judgment burden with respect to the taxation of the settlement payment. They failed to show that they would not have owed the tax liabilities, even based on their hypothetical history. The, in particular, the income from the car dealership would have been taxable one way or the other, and they never deal with that or address that. There are two other issues that the taxpayers raise. I see my time for my argument is almost up, so I would refer the court to our briefs on the legal expenses, as well as the loss deduction for the taxes they paid. Well, you certainly have the opportunity in your rebuttal to respond to those arguments. That's fair, since it's their appeal from those issues, if you would like. Okay, thank you, Your Honor. Thank you very much. Mr. Reschle. Thank you, Your Honors. I'm Jason Reschle. Derek Teter and I represent Mike and Amy McKinney. I want to address a couple things that you raised in the issue, and the key is when you look at Clark, an election is a fact. They made an election to file a joint return. That fact is a fact. If you can ignore elections, all the cases the IRS has against taxpayers that involve change of accounting method wouldn't exist, because an election is a fact. So the government spends a lot of time talking about that the McKinneys didn't pay the right amount of tax. They paid the right amount of tax. That was $2.2 million with the tax, the interest, and the penalties. They paid the right amount of tax. What we're dealing with here is the situation of being reimbursed for the loss they incurred for a tax they should never have had to pay. I think, and I think Ms. Bringer can correct me if I'm wrong when she gets back up again, but I think the line that the government is trying to draw with Clark is that Clark involved a decision about how to file, but did not involve a case where taxpayers were stuck with the financial transactions they entered into as a historical fact. So, in other words, how you file may get you where you want to be in this case, but the underlying transactions can't. And so the argument here, I think, goes that your clients are stuck with the way that they structured things and not just the way that they filed their taxes. I don't know if that's a workable line, but I think that's the line the government is trying to draw. I think, I agree with you, that's what the government is trying to draw, and I don't think it's a valid line to attempt to draw. Because what the issue that you have is, you in fact have a circumstance where if Grant Thornton had done everything that we're supposed to do, they would have had a valid ESOP, they would have had the earnings within that ESOP, stay within that ESOP, that money still would not be taxed. What's your response to the argument that the car dealership never could have really been in the ESOP? It could have been. It would have been done in a different structure. You can invest in lots of different things. They could have held it within a C-Corp. They could have done a variety of ways to make that work. But they were advised improperly by Grant Thornton. So that's part of the malpractice itself as well. So the whole point is, is that if this would have been done right, they wouldn't have paid the $2.2 million. If we agree with you on the legal point that malpractice that leads to overpayment of taxes is not taxable, do we have to figure out, do we have to do our own tax analysis and figure out what your clients really, really could have done or would have done? I don't think you have to. Well, I don't think you have to figure out what that tax amount is in this case because the government never really challenged that that was the amount of the loss. I mean, the only thing that they really raised was an issue about whether something should be allocated to punitive damages because there was a punitive damage claim within the petition against Grant Thornton. But because the loss was less than what the amount of actual damage is, the district court got rid of that case. So I don't think in this case you have to do that. With respect to a general question, if in fact the malpractice gave rise to the loss, that is the amount of the loss. You put on evidence in the district court that had everything been done the right way by Grant Thornton, there would have been no tax liability or a lesser tax liability? I think if you look at the statement of Mr. McKinney, that's what we said and it wasn't challenged. Which one of the two? That there would have been no tax liability or it would have been a small tax liability? There wouldn't have been a tax liability. Zero. Okay. And that wasn't challenged. So it went from zero to what, two point something million? $2.2 million. Okay. Yeah. And so the settlement of the malpractice case against the accountants picked up $800,000 of that. That is all that we in fact, that's all that McKinney's in fact received. If we agree with you that that $800,000 is not taxable, how can we agree with your arguments about the attorney's fees? It seems that those arguments are rather inconsistent with one another. I think that the court was incorrect as to the attorney fees because in my view, when you look at it, those attorney fees were incurred with respect to the sole proprietorship. I mean, Mr. McKinney started his automobile dealership consulting business, a large part of brokerage type business, advising people how to sell their dealerships. He started that in 1990. He ran it as a sole proprietorship. He continued to run it until he talked to Grant Thornton in the late 90s in which they then said, you need to do this as an S Corp ESOP. Advised him to do it. He did it. That advice was consistent with his sole proprietorship when you in fact go look at that. And then you look at the way the settlement treated it, which they treated it as being earned directly by him. And then after the ESOP was shut down, he continued to do it as a sole proprietorship. So in my view, yes, the legal fees are in fact business expense deductions. In fact, there's a revenue ruling we cite too that talks about tax advice with respect to business is in fact treated as trader business income or trader business expense as opposed to miscellaneous itemized deduction. So in my view, you should hold in our favor with respect to that. Well, your client gets a general deduction of the regular deductions. What's the difference between that and what you're claiming? The impact is that if it is a miscellaneous itemized deduction, it is subject to a 2% limitation so that you can only deduct it to the extent that it exceeds 2% of your adjusted gross income. And then there's an additional 3% above AGI that you have to have of aggregate itemized deductions. And finally, the last element, which is probably the most important element, is that a miscellaneous itemized deduction is not deductible for alternative minimum tax purposes. And so effectively because of the levels of his income, when you take that deduction away because you can't take it for alternative minimum tax purposes, effectively it really diminishes the value of the deduction tremendously. What's the difference? Have you calculated it? We did calculate it and I think it probably had an impact. The AMT rate is a 28% rate. The miscellaneous itemized deduction was about $400,000 if I remember correctly. So approximately $120,000 of tax liability, I would guess. Just pulling, I mean, if I was back in my office, I could tell you precisely. I didn't see it in the brief. It may have been there, but I didn't see it. But ballpark, I think that number would be about $120,000. Let's talk about what I think is probably your weakest argument, at least from my perspective, and that is being able to deduct the $1.4 or so million in unreimbursed loss after your clients have entered into a settlement agreement with the IRS. It just seems crazy to me that if your clients, for whatever ultimate reasons, had to pay this $2.2 million due to professional malpractice, but they agree they have to pay it, they enter into an agreement with the government, they say that's the amount we had to pay, and now you get to deduct that unreimbursed amount from a later tax return? Explain that to me. So the explanation of that, and I will agree that is the weakest part of the argument, but the explanation of that is quite simply this. If you, in fact, look at Clark and what Clark specifically states, Clark basically says this is a loss that they realized, and that loss that they realized was that they paid money that they should not have, in fact, paid. The advice took away money. They had their loss. They would not have otherwise realized that loss, and what Clark said, when you look at the language of Clark, is that what it said was that to the extent that the loss was, they said that because the loss was fully reimbursed, if you would have deducted the loss, you wouldn't get it. But because they had no deduction of the loss, the settlement proceeds were, in fact, tax-free. When you look at the settlement agreement, the closing agreement with the IRS, and you go parse through the words, that technically is not a loss attributable to that, but I will agree that is by far the weakest argument that we have. Do you dispute the 2004 versus 2005 liability raised by the United States, or do you think that that, too, is waived, and the United States' apparent failure to challenge the $2.2 million as the amount of the loss? I think they waived it. That's the inherent failure of what the government did. I mean, they never challenged that this, in fact, was, in fact, what the loss was. They challenged, the only way they challenged it is they said that it was based on hearsay, because Mr. McKinney wasn't knowledgeable enough about what all the faults were and what Grant Thornton did. And Mr. McKinney probably didn't know all the details of the problems, because I don't think many people understand ESOPs and all this other stuff. If I had to, I could draft one up and I could do it. I talked to one of my partners before I came up here and I said, could you throw it together in 15 minutes? And he said, yeah. But Mr. McKinney lived the audit. He lived the IRS pointing out what the problem was. He dealt with counsel who represented him in that audit. They told him what the problems were. We had ESOP counsel explain to him what the problems were. The problems were so dramatic in this case that it was crazy. I mean, they didn't even adopt the plan. They didn't have the board of directors have the meeting to do the things, to put, to dot the i's, to cross the t's, to make it even work. It was crazy that one would have done that little in doing this. And so, as a result, there was really nothing that you could do but, in fact, pay the tax. There was no basis to challenge because they just failed to do anything. And if they failed to do anything, you really couldn't do anything. But if they would have done it right, it could have worked. And it could have worked very well. And, in fact, Mr. McKinney would not be pulling the money out for probably another, knowing Mike, probably for another five or ten years. Eventually, he'd be taxed on it, but maybe at a different rate, right? Maybe, maybe not. The issue is, if Mike did the same type of estate plan that I have, everything in my pension plans go to charity. But I don't know if Mike has the same view of life that I have. You get around Old Connolly. Well, Old Connolly, I don't see as an issue. Because what we have here is that we have a situation in which this is a recovery of capital. Old Connolly has no relevance to it. Old Connolly was a situation where an exec, and actually it was several executives of a corporation, said, go pay my income tax on my salary. That has no relevance to here. This is a circumstance where there was, in fact, a real loss. This tax never should have been paid. And if they would have gotten proper advice, it wouldn't have been paid. What's funny is that the government is selective in how they deal with Clark. Because if you read Syntax, which the government specifically cites to, and Syntax was a circumstance in which the government, one group of the government, the SNL group of the government, tried to get people to buy companies and to use the tax benefits as the incentives for other healthy savings and loans to save bad ones. So that's what they encouraged to happen. And what then happened is Congress didn't like it. So Congress passed a law to abrogate the contracts. And in Syntax, the taxpayer sued the government for abrogating the contract improperly. And when they sued to do that, the government said, you have a right to damages under your contract. That was the Court of Claims that held that. The taxpayer, as part of that, said, you've got to gross that up to cover my tax burden when I receive that amount. And what the government said was, no, Clark, that's a recovery of damages because of our abrogation of the contract. Clark says it's not taxable. In Syntax, the Court of Claims agreed with them, agreed with the government that it was not taxable and therefore they didn't have to do anything and they did not gross the number up. And I apologize. I believe my time is up. All right. Thank you so much. Thanks a lot. Before you get started, what's your response to his waiver argument on the $2.2 million? Your Honor, we respond to that argument on pages 24 and 25 of our reply brief. And there we explain that we did not only make a hearsay objection in the district court and the summary judgment briefing. We also objected more broadly because the assertions were, quote, not supported by admissible evidence. But did you make those arguments in your initial brief? I mean, was that part of your challenge in the initial brief? To this court, you mean, Your Honor? Yes. Yes, Your Honor. We did argue that they failed to carry their burden of showing that even if, in contrast to National Alfalfa and Safety Card, they could hypothetically rewrite their history, that they would not have owed the tax liabilities. You made that argument. I know you did. But did you make the hearsay ground argument and the other argument that at the end of the day, the affidavit, the declaration, was insufficient as a matter of law? Or was it different than that? Well, Your Honor, we certainly argued that they did not show that they did not owe the tax liabilities. I'd have to look back at our brief to see what specifically we said about that. But we certainly raised that argument that they did not meet their burden on summary judgment of making those showings. And what page of your brief did you say that was on? In the reply brief, Your Honor, that's on page 24 and 25. And in the opening brief, around pages 57 through 60 or so, was where we argued that the McKinney's failed to show that they hypothetically could have avoided the tax liabilities. Judge Grant, you asked if court would have to do a new tax calculation here if the court accepted the argument that their tax history could be hypothetically rewritten such that the settlement payment could be excluded from tax. The taxpayers have the burden of showing that they would not have owed the tax liabilities. In a tax refund suit, of course, the taxpayers bear the burden. They didn't put in any evidence to support that idea. Mr. McKinney is not qualified to go through the tax calculations. And as we've already discussed, we said that there is insufficient evidence to show that they owed no tax liabilities. Now, a key to that is this car dealership piece. Now, perhaps it could have been structured in some other way. But there's no way that I'm aware of where no tax would have been owed on that car dealership. If it was structured as a C corporation, C corporations, of course, have their own income tax to pay. So that would have been taxed. And if Mr. McKinney owned it, as he does today, it also would have been taxed to him. Understanding that you don't have the burden in a refund suit of this type, did the government put on any evidence to support what you just said? No, Your Honor. The government did not. I would refer the court to our briefs with respect to the business loss deduction for the tax liabilities they paid. Are there any further questions from the court?  Thank you both very much. Thank you very much. Thank you. Take your time and get set. Our third case is number 18.